Lee v. SSA                              CV-96-188-JD  02/06/97

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Geary Lee

    v.                                Civil No. 96-188-JD

Commissioner, Social
Security Administration


O R D E R


The plaintiff, Geary Lee, brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g),

seeking review of a final decision of the defendant, Commissioner

of the Social Security Administration ("Commissioner"), denying

his claim for benefits under the Act.  Before the court are the

plaintiff's motion for an order reversing the decision of the

Commissioner (document no. 5), and the defendant's motion for an

order affirming the Commissioner's decision (document no. 7).


Background

Pursuant to Local Rule 9.1, the parties have filed a joint

statement of material facts, which the court incorporates

verbatim:

Plaintiff filed concurrent applications for Disability
Insurance Benefits and Supplemental Security Income benefits on
June 21, 1994.  (Tr. 68-71, 123-140).  He alleged disability
since April 1, 1993 (Tr. 68, 123) on grounds of chronic
obstructive pulmonary disease, coronary artery disease, diabetes
mellitus, degenerative arthritic changes in his lower back and a

weakened left knee. (Tr. 93, 98). Plaintiff has a GED and a past work history as a machine operator, youth counselor, tree worker, maintenance man and wool mill worker. (Tr. 97).

### Medical Evidence Prior To Alleged Onset Date

Mr. Lee has had two surgeries on his knee performed by Dr. John Ayres in 1984-1985. (Tr. 58, 98) According to Dr. Ayres, Mr. Lee had an anterior cruciate deficient knee which gave out easily.[1] (Tr. 169). Dr. Ayres gave Mr. Lee a 15% disability based on the knee and precluded any occupation that involved prolonged standing, turning, twisting, heavy lifting and work on rough ground. (Tr. 169).

On June 1, 1992, Mr. Lee first saw his treating physician, Dr. William Palmer. Dr. Palmer diagnosed diabetes mellitus. (Tr. 151). Dr. Palmer saw Mr. Lee several more times in June 1992 and again in August 1993. (Tr. 152-154).

Mr. Lee had slipped on ice and fell directly on his lower back on November 21, 1992. (Tr. 174). At the Valley Regional Hospital ER, he complained of severe low back pain. The diagnosis of the ER doctor was acute low back strain. (Tr. 174). A lumbar spine x-ray taken on November 22, 1992 found degenerative arthritic changes particularly at L3-4, L4-5, and L5-S1. (Tr. 175).

### Medical Evidence Following Alleged Onset Date

The earliest evidence of record following the plaintiff's alleged onset date is from August 1993 (Tr. 154). At this time, Plaintiff was seen by Dr. Palmer who noted that the plaintiff was not having any significant symptoms related to his diabetes. The rest of Plaintiff's exam was essentially normal (Tr. 154). Blood tests, taken at this time, revealed that the plaintiff's cholesterol level was normal and his glycated hemoglobin was high (Tr. 155-156).

On April 5, 1994, Mr. Lee returned to see Dr. Palmer because he had trouble breathing. Dr. Palmer diagnosed chronic

---

[1] Anterior cruciate deficient knee refers to a problem in the front ligaments of the knee. Taber's Cyclopedic Medical Dictionary, 16th Edition.

2

obstructive pulmonary disease (COPD). (Tr. 157). Mr. Lee also complained about occasional chest pain upon exertion. (Tr. 157). Dr. Palmer ordered a thallium stress test. (Tr. 158) He also arranged for Mr. Lee to see a cardiologist, Dr. Jon Wahrenberger.

The stress test on April 18 found a small to moderate size area of ischemia[2] in the inferior wall at the base of the heart. (Tr. 180). Mr. Lee had to stop his treadmill test because of shortness of breath and chest pain, however during the test, the plaintiff's blood pressure was only slightly elevated and there were no obvious EKG changes (Tr. 181). He continued to complain of chest pain of moderate severity as well as shortness of breath both during exercise and while at rest. (Tr. 177). At his follow up appointment on April 24, Dr. Palmer started Mr. Lee on Procardia XL. (Tr. 158).

Mr. Lee saw Dr. Wahrenberger for the first time on April 28. Dr. Wahrenberger expressed concern about Mr. Lee's progressively worsening exertional dyspnea. (Tr. 185-186). He thought it was likely Mr. Lee had coronary disease. He noted a fairly extensive reversible cardiac defect although Dr. Wahrenberger found Mr. Lee's chest pain "atypical". (Tr. 185-186). Because of Mr. Lee's multiple cardiac risk factors, Dr. Wahrenberger recommended weight reduction, stopping smoking completely and diet control.

Dr. Wahrenberger found Mr. Lee's past medical history significant for 1) hypertension; 2) Type II diabetes mellitus; 3) peripheral neuropathy secondary to diabetes; and 4) arthroscopic surgery on the left knee. (Tr. 185).

Mr. Lee underwent heart catheterization and angiography in May 1994. The angiogram showed a 60% lesion in the left main artery and a 75% stenosis in the right coronary artery. (Tr. 188). On May 7, Dr. Wahrenberger stated he was extremely concerned about the lower anterior descending lesion but he did not believe the angiogram demonstrated significant disease. He felt Mr. Lee's thallium test was a false positive.[3] (Tr. 188).

---

[2]Ischemia refers to insufficient blood supply to the heart muscle. Taber's Cyclopedic Medical Dictionary, 16th Edition.

[3]A Thallium stress test is a way of evaluating cardiovascular fitness. Because these tests can be difficult to read, they

He did not have an explanation for Mr. Lee's exertional dyspnea. (Tr. 189). He felt it might be related to COPD or asthma. (Tr. 189). Dr. Wahrenberger arranged for pulmonary function testing.

On May 20, 1994, Mr. Lee's pulmonary function test showed a significant restrictive defect. (Tr. 190-191). His FVC was 2.62 (54%), FEVI 2.31 (62%) and his FEVI/FVC ratio was 98[4] (Tr. 190).

When Mr. Lee returned to see Dr. Wahrenberger on June 1, Dr. Wahrenberger again stated that he did not believe Mr. Lee had significant coronary disease, save for the 75% lesion in his non-dominant right coronary artery. He remained concerned about the exertional dyspnea, especially in light of the pulmonary function test. (Tr. 191).

Mr. Lee continued to have episodes of angina and he was also very limited in his breathing. (Tr. 192). Dr. Wahrenberger started Mr. Lee on a trial of Albuterol inhaler, a bronchodilator. Mr. Lee's breathing did not improve. (Tr. 192-193). He was unable even to walk his dog. (Tr. 192). By June, Dr. Wahrenberger decided that further treatment of Mr. Lee's lung problem should be left to Dr. Palmer.

In September 1994, Dr. Palmer wrote that Mr. Lee had significant COPD, coronary artery disease and diabetes with exertional dyspnea that makes employment he had experience with impossible. He urged reconsideration of his disability recommendation and at the very least, help with job retraining. (Tr. 163).

Dr. Palmer answered medical interrogatories in December 1994 and he then diagnosed Mr. Lee with coronary artery disease,

---

sometimes generate "false positive" results which may not be accurate. Taber's Cyclopedic Medical Dictionary, 16th Edition.

[4]FVC is forced vital capacity. It is the total volume of air that a person can blow out of their lungs in one breath. FEV1 means forced expiratory volume at one second, the volume of air that a person can blow out in one second. The values achieved in FVC and FEV1 are measures of the degree of chronic obstructive pulmonary disease. Social Security Disability Practice (1996 Ed.), by Charles T. Hall, West Handbook Series p. 393.

4

reactive airway disease, diabetes mellitus, hyperlipidemia[5] and peripheral neuropathy secondary to diabetes.[6] Dr. Palmer limited Mr. Lee to 6 hours sitting per day; 1 hour standing per day (15 minutes at one time); 5-10 pounds maximum occasional lifting; and no carrying. (Tr. 166). He restricted Mr. Lee from working in an environment with gases and fumes, dust, extreme heat or cold, moisture, humidity or vibration. (Tr. 166). Dr. Palmer found Mr. Lee's impairments limited his ability to grasp, reach, lift up to and above shoulder level and carry objects. He also wrote that his ability to perform fine manipulation was limited to some degree because of neuropathy. (Tr. 167).

Dr. Palmer felt Mr. Lee could only w[alk] 400-500 feet on a flat surface without having to rest because of shortness of breath. (Tr. 165) He felt Mr. Lee would be unable to walk on an inclined surface due to significant dyspnea. (Tr. 165). Dr. Palmer categorized Mr. Lee's pain as "moderate". He wrote his impairments would be likely to cause pain and shortness of breath upon exertion. (Tr. 165-166)

On January 17, 1995, Mr. Lee saw a pulmonary specialist, Dr. H. Worth Parker. Dr. Parker felt Mr. Lee was doing "baseline poorly" now. (Tr. 195). He thought Mr. Lee might have emphysema but he wanted Mr. Lee to undergo a thin cut CT Scan, a helpful test for difficult dyspnea cases. (Tr. 195) He felt Mr. Lee's pulmonary function test was suggestive of a restrictive ventilatory defect.

Dr. Parker wrote a further letter about Mr. Lee in October 1995. The thin cut CT Scan did not demonstrate emphysema but there was thickening in the bronchial walls. (Tr. 201). Dr. Parker stated that the positive findings on pulmonary function tests and the paucity of findings on CT scans and chest x-rays was confusing. Dr. Parker stated that Mr. Lee does have pulmonary function abnormalities that would make him breathless

_____

[5]Hyperlipidemia is excessive quantity of fat in the blood. Taber's Cyclopedic Medical Dictionary, 16th Edition.

[6]Peripheral neuropathy refers to functional disturbance and/or pathological changes in the peripheral nervous system. May be associated with numbness, tingling, or a burning sensation in extremities. Merck Manual, 16th Edition.

with moderate exertion. (Tr. 200). He found Mr. Lee's case "frustrating." (Tr. 200).

Mr. Lee had also had problems with diabetes for the last ten years. (Tr. 50). Glucose test results from April and May 1994 demonstrated poor control of diabetes as did a hemoglobin test. (Tr. 52, 183-184). He testified that he napped for an hour or so everyday in the afternoon because of fatigue. (Tr. 49). He also complained of numbness in his hands and feet. (Tr. 48). He testified that both his hands and feet frequently crack wide open. (Tr. 48). He gets infrequent diabetic attacks which cause cold sweats and shakes. (Tr. 49). Mr. Lee takes Diabeta, a pill to help control diabetes.

Based on this factual record and subsequent to a hearing, the ALJ concluded that the plaintiff's complaints of pain were exaggerated, and that the plaintiff has the exertional capacity to perform sedentary work (Tr. 21).[7] Although the ALJ found that the plaintiff is unable to perform his past relevant work as a machine operator, youth counselor, tree worker, maintenance worker, or wool mill worker and that his RFC for a full range of sedentary work is reduced by pain and shortness of breath (Tr. 23), the ALJ nonetheless concluded that, in light of the plaintiff's age, education, and work experience and the degree to which his RFC was compromised by his limitations, he is not disabled (Tr. 23). The plaintiff seeks review of the ALJ's findings.

_____

[7]In a separate section of the decision, the ALJ found that the claimant has the RFC "to perform the physical exertion and nonexertional requirements of work except for lifting and carrying more than 10 pounds" (Tr. 22).

6

## Discussion

Pursuant to 42 U.S.C. § 405(g), the court is empowered to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In reviewing a Social Security disability decision, the factual findings of the Secretary "shall be conclusive if supported by 'substantial evidence.'" Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)). The court "'must uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)); accord Richardson v. Perales, 402 U.S. 389, 401 (1971). Moreover, "[i]t is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." Irlanda Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222); see also Burgos Lopez v. Secretary of Health and Human Servs., 747 F.2d 37, 40 (1st Cir. 1984).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); accord Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

A.    The ALJ's Conclusions Concerning Lee's RFC

The plaintiff raises two arguments bearing on his claim that the ALJ erred in concluding that he has the RFC to perform sedentary work.

First, he contends that the ALJ failed to accept the conclusions of Dr. William Palmer, the plaintiff's treating physician, in concluding that the plaintiff has the RFC to perform the exertional requirements of sedentary work. However, the argument rests on a misinterpretation of Palmer's conclusions, which are consistent with a finding that the plaintiff has the capacity to perform these exertional

8

requirements.  See 20 C.F.R. §§ 404.1567(a), 404.1572(a)(1996)[8];

S.S.R. 83-11 (claimant possesses exertional requirements of a

specific RFC if he possesses essentially all of the minimum

exertional capabilities that the RFC requires).  Indeed, Palmer

concluded that, even in light of the plaintiff's shortness of

breath and "moderate" pain, the plaintiff can sit for as much as

two hours at a time and for six hours in an eight-hour day; can

stand or walk for as much as fifteen minutes at a time and for

one hour in an eight-hour day; and can walk 400-500 feet on a

flat surface and could lift five to ten pounds occasionally (Tr.

169).  Moreover, the ALJ's conclusion is supported by RFC

assessments performed in July 1994 and December 1994 by two non-

---

[8]20 C.F.R. § 404.1567(a) provides:

> Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying
> articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which
> involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1572(a) provides:

> Substantial work activity is work activity that
> involves doing significant physical or mental
> activities.  Your work may be substantial even if it is
> done on a part-time basis or if you do less, get paid
> less, or have less responsibility than when you worked
> before.

examining Disability Determination Services physicians.  <u>See</u>
<u>Berrios Lopez v. Secretary of Health & Human Servs.</u>, 951 F.2d
427, 431 (1st Cir. 1991).  Based on a review of the plaintiff's
records, these physicians concluded that the plaintiff can
occasionally lift or carry twenty pounds, stand about six hours
in an eight-hour workday, and sit about six hours in an eight-
hour workday (Tr. 74-83).  Thus, there is substantial objective
evidence in the record to support the ALJ's findings as to the
plaintiff's capacity to perform the exertional requirements of
sedentary work.

However, the plaintiff also argues that the ALJ's assessment
of his RFC fails to account properly for his subjective
complaints of pain.  Although the ALJ determined that the
plaintiff's RFC to perform a full range of sedentary work is
limited by his pain, the plaintiff contends that the ALJ failed
to place enough weight on the plaintiff's complaints of pain
because he erroneously concluded that they are "somewhat
exaggerated" and "not fully credible" (Tr. 21).

The ALJ is required to consider the subjective complaints of
pain or other symptoms by a claimant who presents "medical signs
and findings, established by medically acceptable clinical or
laboratory diagnostic techniques, which show the existence of a
medical impairment that results from anatomical, physiological,

10

or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C.A. § 423(d)(5)(A) (West Supp. 1996); see also Avery v. Secretary of Health & Human Servs., 797 F.2d at 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529 (1996); S.S.R. 96-7p. "[C]omplaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." Dupuis v. Secretary of Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989); see Bianchi v. Secretary of Health & Human Servs., 764 F.2d 44, 45 (1st Cir. 1985) ("The Secretary is not required to take the claimant's assertions of pain at face value.") (quoting Burgos Lopez v. Secretary of Health & Human Servs., 747 F.2d 37, 40 (1st Cir. 1984)).

Upon a finding that an impairment could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." S.S.R. 96-7p; see also 20 C.F.R. § 404.1529(c). Where the individual's statements about the effects of pain are inconsistent with objective medical evidence, the ALJ must determine whether the claimant's complaints are credible, and may consider, inter alia, the individual's daily activities;

11

the location, duration, frequency and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms. Id.; see also Avery, 797 F.2d at 23. Finally, the court gives deference to credibility determinations made by the ALJ, particularly where the determinations are supported by specific findings. Frustaglia v. Secretary of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing DaRosa v. Secretary of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1985)).

In the instant case, the ALJ found the claimant's assertion that he is unable to work due to pain is inconsistent with the plaintiff's impairments (Tr. 20). Accordingly, he considered evidence of the plaintiff's daily activities, which include cooking, shopping, driving, going on short walks, and swimming (Tr. 21). The ALJ also noted that the plaintiff suffers no significant side effects from his medication and, after making reference to the objective evidence and the restrictions

12

described by the plaintiff's physicians, concluded that the plaintiff's complaints are not fully credible (Tr. 21).

The court finds the ALJ's inquiry into the plaintiff's allegations of pain to be insufficient. Beyond his mention of the plaintiff's daily activities and the lack of side effects from medication, it is not apparent which, if any, of the factors articulated in Avery the ALJ considered. Significantly, the ALJ's decision contains no mention of either the intensity or duration of the plaintiff's pain or the effectiveness of the his medication, and the transcript of the plaintiff's hearing does not reveal any substantial inquiry into these or any related matters. Moreover, the ALJ's conclusion fails to account for Palmer's inability to diagnose the source of the plaintiff's chest pain (Tr. 164) or the plaintiff's cardiologist's repeated characterization of the plaintiff's chest pain as "atypical." (Tr. 186, 187, 191). Although it is not for a reviewing court to second-guess the determinations of the ALJ concerning a claimant's subjective complaints of pain, deference is not appropriate where, as here, the record does not evince a full consideration of the nature and effects of the claimant's complaints.

Accordingly, the court finds that the ALJ's conclusion concerning the plaintiff's RFC, although supported by substantial

13

objective evidence, is not based on a sufficient consideration of the plaintiff's subjective complaints of pain.  On remand, the Commissioner will consider these complaints in light of the objective medical and other evidence and the Avery factors.

B.  The ALJ's Reliance on Grid Rule 201.28

The plaintiff also contends that the ALJ erred in relying on 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("the grid"), rather than eliciting testimony from a vocational expert, to determine, based on the plaintiff's RFC, age, education, and work experience, that significant numbers of jobs exist in the national economy that the plaintiff can perform (Tr. 22).  Specifically, the plaintiff claims that reliance on the grid is inappropriate where, as here, a claimant's exertional and nonexertional limitations significantly affect his ability to perform the full range of jobs at a particular exertional level.

Where a claimant's capacity to do a full range of sedentary work is reduced by an exertional or nonexertional limitation, the ALJ must consider the extent to which the claimant's limitation erodes the sedentary "occupational base."  S.S.R. 96-9p; see also Ortiz v. Secretary of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).  In the event an impairment places a significant restriction on any activity necessary for the performance of

sedentary employment, consultation with a vocational expert may be appropriate.  S.S.R. 96-9p.

The plaintiff has identified three abilities that he claims are both necessary to the performance of sedentary employment and are restricted by his impairments and his pain and shortness of breath: his ability to stand or walk; his ability to use his hands and fingers; and his ability to work around dust and fumes.[9]  S.S.R. 96-9b provides that consultation with a vocational resource concerning the erosion of the occupational base is appropriate if the claimant is unable to stand or walk for "slightly less" than two hours during an eight-hour day, if the claimant suffers significant manipulative limitations, or if the claimant must avoid significant exposure to dust and odors.

Here, the ALJ made no specific findings concerning the limitations on the plaintiff's ability to stand or walk, perform fine manipulation, or the extent to which the plaintiff's ability to work is limited by exposure to dust and odors.  However, the plaintiff's treating physician opined that the plaintiff (1) can stand or walk for only one hour in an eight-hour day (an amount

_____

[9]The ALJ found that there was no objective evidence in the record to support the plaintiff's claim that his peripheral neuropathy limited his ability to reach, grasp, and lift objects up and above shoulder level (Tr. 7).  The plaintiff has not pointed to any evidence that undermines this conclusion.

that cannot fairly be characterized as "slightly less" than two hours); (2) is "somewhat" limited in his ability to perform fine manipulation; and (3) should avoid exposure to dust and fumes (Tr. 166-67). Depending on the weight assigned to these medical opinions, any of these limitations, whether considered individually or in combination, may be sufficiently significant to require consultation with a vocational expert to determine the extent to which they erode the sedentary occupational base. See S.S.R. 96-9b.

In the absence of specific findings by the ALJ concerning the effect of these limitations on the plaintiff's ability to work, the court is unable to determine whether the ALJ should have consulted with a vocational expert to determine the extent of the erosion of the plaintiff's occupational base. Accordingly, on remand, after reviewing the plaintiff's subjective assertions of pain in light of the medical evidence and the Avery factors, the Commissioner shall determine the extent of the limitations on the plaintiff's abilities to stand or walk and perform fine manipulation and the extent of his environmental limitations. If any of these limitations are deemed significant, the Commissioner shall, consistent with S.S.R. 96-7p, consult with a vocational expert to determine the erosion of the sedentary occupational base.

16

<u>Conclusion</u>

The plaintiff's motion for an order reversing the decision of the defendant (document no. 5) is granted.  The defendant's motion for an order affirming the Commissioner's decision (document no. 7) is denied.  The case is remanded to the Commissioner for further proceedings consistent with this opinion.   The clerk is ordered to close the case.

SO ORDERED.

 

 

_____
Joseph A. DiClerico, Jr.
Chief Judge

February 6, 1997

cc:   Jonathan P. Baird, Esquire
      David L. Broderick, Esquire

17